617 So.2d 517 (1993)
Jerry YOUNG
v.
ARMADORES de CABOTAJE, S.A. and K & B Equipment Company, Inc.
No. 90-CA-1107.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 1993.
Rehearing Denied May 12, 1993.
*521 Fredericka Homberg Wicker, Lawrence S. Kullman, Lewis & Kullman, New Orleans, for plaintiff/appellee.
Miles P. Clements, Andrew S. De Klerk, Lemle & Kelleher, New Orleans, for defendant/appellant Empresa Nacional Siderurgica, S.A.
Gerard T. Gelpi, Randall C. Coleman, III, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, for defendant/appellant Armadores de Cabotaje, S.A.
Before WARD, ARMSTRONG and PLOTKIN, JJ.
ARMSTRONG, Judge.
Defendants, Armadores de Cabotaje, S.A ("ARCASA") and Empresa Nacional Siderurgica, S.A. ("ENSIDESA"), vessel owner and vessel charterer, respectively, appeal a trial court judgment awarding plaintiff, Jerry Young, a longshoreman, $1,700,000.00 in damages for personal injuries sustained while offloading the M/V LORENA. The trial court also dismissed cross-claims filed by ARCASA and ENSIDESA against each other.
ENSIDESA is a Spanish company which manufactures and ships steel from a port in Aviles, Spain, to, among other ports, the Port of New Orleans, Louisiana. This appeal centers around ENSIDESA's October 1982 shipment of a cargo of 60-foot steel "I-beams" to New Orleans aboard the M/V LORENA, a ship owned and crewed by ARCASA. ENSIDESA was the charterer of the M/V LORENA, as well as the shipper and owner of the steel beams transported on the ship. The agreement between the parties was a time charter, a contract by which the owner of a vessel lets a vessel to another person for a specified time or use. The owner continues to operate the vessel with its master and crew who remain servants of the owner.
The cargo of steel beams, which were banded together in bundles, was loaded aboard the M/V LORENA in the port of Aviles, Spain by ENSIDESA stevedores. The "I beams" were "stowed" in the "H" formation. That is, if one were looking at the end of the beams down their length, the ends resembled the letter "H". Beams may also be stowed so that the ends resemble the letter "I". Pieces of wood, or "dunnage," were placed between the layers or tiers of beams.
Cooper Stevedoring Company, Inc. ("Cooper"), had contracted with ENSIDESA to offload the steel beams in New Orleans. Plaintiff was a longshoreman employed by Cooper. The offloading began on November 21, 1982. Plaintiff was working in the hold of the ship with a work "gang" gathering and securing bundles of steel beams to be lifted out of the hold by a crane situated on a barge moored in the Mississippi River between the M/V LORENA and the dock. The members of plaintiff's gang, including those working in the hold with him, the foreman, the "flagman" or man who signals the crane operator, and the ship "superintendent," were all Cooper employees. The crane being used to unload the steel was owned by Cooper, was situated on a barge owned by Cooper, and was operated by a Cooper employee. The offloading operation was under the sole direction of Cooper personnel without any assistance whatsoever from ENSIDESA or ARCASA personnel.
Present during the offloading were the longshoremen in the hold of the ship, including plaintiff, a foreman, and a flagman who positioned himself where he could observe the men in the hold and the crane. The operator of the crane manipulated the crane only at the direction of the flagman. The ship superintendent, the senior Cooper employee, was also present during the offloading.
*522 The beams were in bundles and the men were lifting no more than three or four bundles at a time, apparently limited by the capacity of the crane. The deeper the men got into the hold, the more crushed they found the wooden dunnage. As a result of the crushed dunnage, bundles of beams were resting directly on the bundles underneath, rather than being separated by dunnage.
The unloading involved "breaking out" bundles of beams so that two chains could be pulled underneath and attached to each end of a "spreader bar" which was lowered by the crane. The spreader bar, here twenty feet long with cables and hooks attached at each end, allowed the crane to safely lift long cargo items, such as the sixty-foot beams, with two points of attachment. In the breaking out process, a "breakout wire," (cable), was slipped approximately six inches under one end of the beams. A man in the hold would then signal the flagman who in turn would signal the crane operator who would lift the end of the beams up approximately three and a half feet so that a chain could be thrown underneath. Then, on a signal from the flagman, the crane operator would lower the beams. The process would then be repeated for the other end of the beams. The two chains would be wrapped around the beams, attached to the spreader bar cables, and the beams lifted out of the hold by the crane.
Normally, the dunnage separating the tiers of beams allowed the breakout wire to be slipped far enough under the beams so that the crane could safely lift the beams so the men could throw the chains underneath. However, the dunnage on the M/V LORENA was so badly crushed that many of the beams were resting on the ones underneath, making it impossible to get the breakout wire far enough underneath. So, the men had to "nip" the beams. "Nipping" involved getting the breakout wire as far under the beams as possible, sometimes just under the edge of one beam. Often, such as on this occasion, pry bars would be used to separate the beams so that the breakout wire could be inserted. After putting the wire under the edge of the beams, on signal, the crane operator would lift the beams slightly, and a longshoreman standing by would place a piece or pieces of dunnage under the beams. The crane would lower the beams and, ideally, the dunnage would support them until the relaxed breakout wire could be moved further underneath so that the ends of the beams could be safely lifted and the chains thrown underneath. One witness testified that sometimes it might be necessary to nip the beams three or four times before getting the wire far enough under the beams to lift them and throw the chains underneath.
In the mid-afternoon hours of November 22nd, the second day of offloading, the men proceeded to nip some beams which were resting on the tier of beams underneath. Plaintiff's job was to place a piece or pieces of dunnage under the beams when the crane lifted them up. The breakout wire was placed as far under the edge of the beam as the men could get it. They signalled to the flagman who signalled to the crane operator to lift up. As the crane began to lift up and the breakout wire tighten, the wire suddenly popped off. The spreader bar began wobbling, swinging the attached breakout wire. The flagman shouted for the men to run but as plaintiff attempted to get out of the way he was struck with the breakout wire or cable and fell, resulting in his sustaining personal injuries.
The case revolves around the condition of the stow. That is, the condition presented by the badly crushed dunnage, requiring the longshoremen to nip the edge of the beams in order to breakout the beams. It is undisputed that the manner in which the beams were stowed, i.e., stacked in the "H" configuration, with the edges resting on the wood dunnage, resulted in the dunnage being crushed to a much greater extent than it would have been had the beams been stowed in the "I" configuration. The edges of beams stowed on the "H" tend to cut the wood.
There was conflicting testimony regarding the safety of the stow. Plaintiff, himself, offered no testimony that the stow *523 was particularly dangerous. He said the work was basic longshoring workoffloading steel. He had used the tools, a pry bar and breakout wire, for years, and had offloaded that type of cargo before. He confirmed that he had used a breakout wire many times on steel stowed like that on the M/V LORENA. According to plaintiff, it was a typical workday, nothing out of the ordinary.
There was testimony by plaintiff in an earlier deposition that he had thought perhaps the boom of the crane had moved, causing the breakout wire to slip off the beams and subsequently strike him. He also stated in a deposition that he thought the cause of the accident may have been the longshoremen trying to lift out too many bundles of beams at one time, i.e., more than four. At trial he explained that these were the things he thought may have contributed to or caused the accident; but that he didn't know the cause. Other witnesses, however, testified that the boom of the crane did not move just prior to the accident, and that the men were not trying to lift out more than four bundles of beams at the time of the accident.
The foreman of plaintiff's work gang on the day of the accident, who was retired at the time of trial, viewed a photograph of the M/V LORENA's cargo hold and testified that he saw nothing dangerous about the stow. He had seen that type of stow many times before, and said it was a "perfect," "safe" stow. He said the people who loaded the steel beams knew what they were doing. He said he would have stopped the work if he had seen something unsafe while the plaintiff and the other men were offloading the vessel.
An ENSIDESA employee, Mr. Garcia, the director of a private section of the Port of Aviles, Spain, testified that in 1982 all steel beams loaded at the Port of Aviles were loaded in the "H" method. They did not begin loading in the "I" method until 1983. He later stated that from 1956 to 1985, 29 years, ENSIDESA loaded steel beams on the "H." From 1985 to the time of trial, April 1989, 80% of the steel beams ENSIDESA loaded were stowed on the "H." Only 20% of steel beams, bound for the United States and Canada, were loaded on the "I." Today, if a customer requests it, ENSIDESA loads steel beams using the "I" method. This is done primarily for ships bound for the United States and Canada. Garcia stated that United States and Canadian buyers request that beams be stowed on the "I" because they arrive in better condition. He testified that the loading longshoremen were following instructions of an ENSIDESA employee, but that the master of the vessel works with an ENSIDESA employee, the chief of port operations, to work out a stowage plan prior to loading a vessel. The longshoremen follow that plan when loading the vessel. Garcia also admitted that it is harder to offload steel beams in the "normal" way when the dunnage is crushed. He vaguely mentioned that one can use a "gigantic clamp," a device apparently used in some unnamed other ports, not the Port of New Orleans.
Another ENSIDESA employee, Captain Cazon, the chief of port operations for the Port of Aviles, testified that he supervised stevedoring operations at that foreign port. He said that before October 1982 he had loaded steel beams on the M/V LORENA using the "H" method. He was still loading ships that way at the time of trial, and stated that to his knowledge, ENSIDESA had never received any complaints from anywhere in the world that the "H" stowage method was dangerous or unsafe to unload. He admitted, however, that United States and Canadian companies had requested that ENSIDESA load steel beams using the "I" method.
Cazon testified that he and ENSIDESA employees prepare stowage plans with the master or captain of the vessel, who must approve the plans; the captain of the vessel has the last word with regard to the method of the stow. When he prepares plans Cazon takes into consideration the safety of the stow. Part of his duty is assuring that the cargo is stowed in a manner which will be safe to persons handling the cargo. Cazon admitted that, although one of the reasons for using dunnage is to separate the tiers of beams to *524 facilitate offloading, loading the beams using the "H" method results in more destruction of dunnage than loading by the "I" method. The witness also admitted that the loading of steel beams in the "I" method takes no more time than loading them in the "H" method and said that the cargo is less likely to be damaged by compression if the "I" method is used. But, he said it's safer for the beams to be stowed in the "H" method because the cargo is less likely to shift during transit, although he admitted that all beams are more stable if bundled together, which, in the instant case were.
Douglas Lemott, a longshoreman since 1974, was working with plaintiff offloading the M/V LORENA at the time of plaintiff's accident. Lemott testified that at the time of the accident they were approximately halfway down into the hold of cargo and were breaking out steel beams which were resting on each other"sort of interlocked"a condition resulting from wood dunnage being crushed by the "sharp edges" of the "H" loaded beams. He stated that he was handling the breakout wire and, because of the crushed dunnage, getting it under the edge of the beams "was dangerous." He said that it was a dangerous stow. Lemott admitted that whether stowed on the "I" or on the "H," it is expected that dunnage is more compressed as they get farther down into the load. He further admitted that after plaintiff's accident, which occurred on the second day of offloading, they finished offloading the vessel, despite the condition being worse after plaintiff's accident. Lemott also stated that beams stowed in the "I" position sometimes fall over.
John Porter, a longshoreman for 26 years at the time of trial, was also working with plaintiff at the time of the accident. He said the dunnage higher up was in good condition but as you got farther into the hold it was more "chopped up," with beams resting on beams. He said it was a dangerous stow. Porter mentioned to his foreman that the dunnage was getting worse, but was told to take his time and be careful. He said he had seen beams stowed both in the "H" and "I" positions "hundreds of times," and had offloaded cargoes loaded both ways. He said from a safety standpoint there was nothing that could be donethe beams had to be offloaded.
Glen Reibe, the Cooper ship superintendent, said that steel beams were usually loaded in the "I" position. He said that there was nothing Cooper could do to correct the situation with regard to the manner of stow. They just had to be careful unloading the steel. He said the stow was dangerous, although he did not stop the offloading because of that danger.
Joseph Johnson, an 18-year Cooper employee, was the Director of Regional Loss Control for the stevedoring company. Also known as a "safety man," he checked those vessels which Cooper was unloading twice a day. He said the dunnage on the M/V LORENA was crushed as a result of the beams being stowed on the "H." He said, "for all practical purposes it might as well have not been there." According to Johnson, the only thing Cooper could do regarding the stow was to work it in the safest manner possible. He admitted that he believed the cargo could be safely offloaded.
Sam Douglas, another career longshoreman21 years on the job at the time of trialtestified that he had unloaded steel beams during his career, but "very seldom" beams stowed on the "H". He said the normal method of stowing beams is on the "I," and he generally offloaded cargoes of beams stowed in that manner. He said that beams stowed on the "H" crush the dunnage and therefore you cannot get the breakout wire under the beams. Douglas was confronted with a statement signed by him reflecting that he had previously reported to a defense investigator that photographs of a vessel loaded with steel beams stowed on the "H" showed beams stowed the only way he has ever seen them stowed. Although Douglas testified that he can write, the statement had been written by the investigator. Douglas maintained that he didn't read the statement before signing it, and that he couldn't recall saying what was contained in the statement.
*525 Plaintiffs presented as a witness, Albert Ross, a "marine surveyor." Ross was accepted as an expert in the area of marine surveying as an expert in safety regarding stevedoring operations.[1] Ross testified that he could not recall ever seeing a ship stowed with steel beams in the "H" manner. He stated that between 1972 and 1977, as a port captain at the Port of Antwerp, Belgium, he had supervised the loading of steel beams in the "I" method. In November 1982 he was hired by Cooper to inspect the condition of the cargo of steel beams on the M/V LORENA. He testified that the beams were stowed in the "H" position and there was considerable damage to the cargo, i.e., bending and flange damage, primarily due to compression of the dunnage. He said the cause of the compression was the weight of the beams together with the method of stowon the "H." Ross said it was a "hazardous" and "dangerous" stownot a "correct" stow.
On cross-examination Ross said he had never been a stevedore or longshoreman. He couldn't recall whether he told the Cooper ship superintendent that he thought the stow was dangerous. He was aware that the foreman of plaintiff's gang thought the cargo was in perfect condition. Although he first stated that he could not recall ever seeing a "full" vessel loaded with beams on the "H," on cross-examination he said that in February 1982 he may have surveyed the M/V LORENA which was loaded with beams stowed on the "H." He also admitted that he may have surveyed three other vessels which apparently were stowed with beams loaded on the "H." Finally, he admitted that he did not know whether the condition of the stow had anything to do with the accident.
The trial court found that ARCASA, as the vessel owner, and ENSIDESA, as the charterer and/or loading stevedore, were both negligent, their negligence being a factual and legal cause of plaintiff's damages. Fault was assessed at 15% to ARCASA and 85% to ENSIDESA. The trial court subsequently denied motions for judgment notwithstanding the verdict and for new trial filed by both ARCASA and ENSIDESA. Both defendants now appeal.

LIABILITY OF ARCASA
ARCASA's primary assignment of error is that the evidence was insufficient to support a finding that it was negligent and that such negligence was a cause of plaintiff's injuries.
We first address the applicable standard of appellate review. Federal jurisdiction over 33 U.S.C.A. § 905(b) claims is based upon the general maritime law. 28 U.S.C.A. § 1333(a); Russell v. Atlantic & Gulf Stevedores, 625 F.2d 71 (5th Cir.1980). State courts have concurrent jurisdiction with federal courts to hear LHWCA cases by virtue of the "saving to suitors" clause of 28 U.S.C.A. § 1333(1); Bynum v. Patterson Truck Lines, Inc., 655 F.2d 643 (5th Cir.1981); Allen v. Keeney, 442 So.2d 1171 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1232 (La.1984). State courts apply their own system for reviewing factual determinations of juries in general maritime law and LHWCA cases. Simmons v. Hope Contractors, Inc., 517 So.2d 333 (La.App. 1st Cir.1987), writ denied, 518 So.2d 510 (La.1988).
The question of negligence in a maritime case is a question of fact for the jury. Randolph v. Laeisz, 896 F.2d 964 (5th Cir.1990). Louisiana appellate jurisdiction extends to review of questions of law and fact in civil cases. La. Const. art. 5, §§ 5 and 10. On appellate review, a court may not disturb the factual findings of a judge or jury unless those findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, Co., 283 So.2d 716 (La.1973).
Plaintiff, a longshoreman, is covered under the Longshoreman's and Harbor Workers' Compensation Act ("LHWCA").[2] Under *526 § 905(b) of the LHWCA, a longshoreman injured on a vessel may recover damages for those injuries from the vessel owner under a negligence theory.[3] § 905(b)'s "vessel" includes a time charterer such as ENSIDESA. See, 33 U.S.C.A. § 902(21); Woods v. Sammisa Co., Ltd., 873 F.2d 842, 846 n. 3 (5th Cir.1989), certiorari denied, Sammiline Co., Ltd. v. Woods, 493 U.S. 1050, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990). In the seminal case of Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the U.S. Supreme Court defined the duties owed by a vessel owner to the stevedore and his longshoremen. These duties were succinctly stated by the 5th U.S. Circuit Court of Appeal in Hill v. Texaco, 674 F.2d 447, 450-51 (5th Cir.1982):
First, before the stevedore begins his work, a shipowner must exercise care to make safe the portions of the ship that it turns over to the stevedore. In discharging this duty the ship may rely on the stevedore's performing its task with reasonable care. The shipowner must also warn the stevedore of hidden unsafe conditions on the ship of which the ship is, or should be, aware.
Second, once the stevedore begins its operations, the shipowner has no general duty to supervise work or to inspect the area assigned to the stevedore, unless custom, contract, or law imposes such a duty on the shipowner. The shipowner need not monitor the stevedore's operations; rather, the shipowner is entitled to rely on the stevedore's expertise and reasonableness.
Third, the Supreme Court made an exception to the general absence of a duty of the shipowner to protect employees of the stevedore during cargo operations. The duty arises when two conditions are fulfilled. If the shipowner becomes aware during the stevedore's work that the ship or its gear poses a danger to the longshoremen, and if the shipowner also learns that the stevedore is acting unreasonably in failing to protect the longshoremen against the danger, then the shipowner acquires a duty to intervene and protect the longshoremen. The shipowner can have knowledge of a defect if the defect develops during the stevedore's operations and the shipowner had actual knowledge, or if the defect exists at the outset and the ship `must be deemed' to have knowledge of it.
(footnotes omitted) (emphasis ours)
In Lemon v. Bank Lines, Ltd., 656 F.2d 110 (5th Cir.1981), the U.S. Fifth Circuit described the judicial balancing of supervisory duties between the vessel owner and the stevedore:
The shipowner is therefore responsible for eliminating dangerous conditions which exist at the outset of the stevedoring operations, but has `no duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations.' It is the stevedore who must see to the safety of cargo operations. (citations omitted)
Id. at 115.
In Lemon, the court held that a vessel owner could be liable under Scindia if it knew or should have known of an improper loading technique and failed to take actions to either correct the stowage or warn the offloading stevedore's employees of the dangerous condition contained in the stow. Lemon, 656 F.2d, at 116. In Harris v. Flota Mercante Grancolombiana, S.A., 730 F.2d 296, 299 (5th Cir.1984), the same *527 court, citing Lemon, again held that a vessel owner could be held liable for negligently stowed cargo which caused an offloading longshoreman to be injured. See in accord, Woods v. Sammisa Co., Ltd., supra.
As in Lemon and Harris, we are concerned in the instant case not with conditions which develop after offloading stevedoring operations begin, but with a condition present when the vessel is turned over to the stevedore. The alleged negligence "occurred in the method and manner of stowing cargo that was delivered to the longshoremen and stevedore." Harris, supra at 299. Therefore, although the alleged dangerous condition caused by the crushed dunnage on the M/V LORENA became more apparent as the longshoremen got deeper into the stow, the second and third Scindia duties are not relevant to our analysis. The primary burden contemplated by Scindia was the duty of the vessel owner to turn over to the offloading stevedore a vessel which could be offloaded with reasonable safety. This is the focus of our analysis.
One dispositive issue is whether the stow was dangerous. To find ARCASA negligent the jury had to find that the stowage of the steel beams resulted in a dangerous condition, a condition which made it more probable than not that the longshoremen could not offload the vessel with reasonable safety. There was considerable testimony adduced at trial regarding this issue, much of it conflicting. The jury was faced with accepting the testimony of those witnesses who stated that the stow was dangerous or those maintaining that it was not. That is, the jury was faced with a credibility call. In Rosell v. ESCO, supra, the Louisiana Supreme Court stated the rule of appellate review when considering findings based upon credibility calls by the factfinder. The court stated:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or other objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder [sic] would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (citations omitted)
549 So.2d at 844-45.
In the bulk of cases dealing with dangerous stows, the issue of whether the condition is actually dangerous appears to be one of fact. See, Harris v. Flota Mercante Grancolombiana, S.A., supra; Woods v. Sammisa Co., Ltd., supra. In the instant case, as in Woods v. Sammisa, defendants argue that the stow was not unreasonably dangerous or out of the ordinary. In addressing this argument in Woods, the U.S. Fifth Circuit, referring to Harris, stated:
[In Harris], evidence that a stow was "dangerous" and "very, very poor[]" was held to be sufficient to support a jury finding of negligence; we did not require that the record contain testimony, almost of a talismanic quality, that the stow be "unreasonably" dangerous or that the cargo could not be discharged with "reasonable" safety. We similarly refuse to do so here.
Whether a stowage method is reasonable depends upon a myriad of factors, including the absolute and relative danger which it presents vis-a-vis other stowage methods, and the feasibility of such other methods. In essence, the question is how a reasonable vessel interest exercising due care would allow the cargo to be stowed, and what it would conclude about its stowage methods.
In Woods, the plaintiff was injured breaking out steel pipe at the Port of New Orleans. Pipe bound for Houston, Texas *528 overlapped pipe being offloaded in New Orleans. Commenting on the sufficiency of the evidence for a finding of negligence on the part of vessel owner, the court stated:
[T]here was ample testimony in this case to support a jury finding that the overlapping condition of the cargo meant that the New Orleans pipe could not be discharged with reasonable safety. Testimony at trial indicated that an overlapping stow was unusual, that it increased the risk of damage to the cargo and injury to the longshoremen, and that those risks could have been avoided by either stowing the Houston pipe without having it overlap the New Orleans pipe as was contemplated by the cargo plan prepared for the time chartereror unloading the overlapping Houston pipe before unloading the New Orleans pipe. In sum, there is ample evidence from which a jury could conclude that the defendants therefore did not exercise reasonable care in providing the longshoremen with a reasonably safe place in which to work. (footnotes omitted)
The duty owed by the vessel owner is measured with regard to an "expert and experienced" stevedore exercising "reasonable care." Woods v. Sammisa, 873 F.2d at 851. The evidence supports the finding that plaintiff and his fellow longshoremen were expert and experienced stevedores exercising reasonable care at the time of the accident.
In the instant case, there was credible testimony to substantiate the factual conclusion that, although it was common for steel beams to be stowed on the "H," that method of stowage increased the risk of damage to the cargo and injury to the longshoremen. The testimony supports the conclusion that the risks to the plaintiff and other longshoremen could have been greatly reduced, if not almost completely eliminated, by stowing the beams using the "I" method of stow, and perhaps, using harder wood as dunnage. The "I" method of stow was just as feasible as the "H" method. The benefits of the "I" stow far outweighed the only problem mentioned, i.e., the possibility that the beams stowed on the "I" might be damaged as a result of the cargo shifting. But, even regarding this factor, one of ENSIDESA's own employees stated at one point that stowing beams on the "I" actually reduced the risk of damage to the cargo. The evidence further supports the conclusion that the vessel owner, ARCASA, knew or should have known that this method of stow presented these risks to longshoremen. That is, "a reasonable owner/operator ... would have perceived the dangers presented by the [stow]." See Woods v. Sammisa, 873 F.2d at 852. The evidence furnishes support for a finding that it was more probable than not that ARCASA's conduct contributed to plaintiff's accident and resulting injuries. We are unable to say that the trial court was clearly wrong in finding that ARCASA was at fault in causing damage to plaintiff.
Evidence that the danger of the stow was open and obvious is no defense to liability here under the first Scindia duty. Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 167 (5th Cir.1990); Woods v. Sammisa, 873 F.2d at 852-53; Stass v. American Commercial Lines, Inc., 720 F.2d 879, 882 (5th Cir.1983); accord Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. at 176, n. 22, 101 S.Ct. at 1626, n. 22; see also, Fernandez v. M/V Rio Limay, 572 So.2d 730, 733 (La.App. 4th Cir.1990), writ denied, 575 So.2d 397 (La. 1991).

LIABILITY OF ENSIDESA
Under the facts of this case, the duty owed under Scindia by ARCASA is not significantly different than that owed by ENSIDESA under Scindia. Based upon the evidence, we are unable to say that the jury would have been clearly wrong to conclude that a "reasonable ... time charterer would have perceived the dangers presented by the [stow]." See, Woods, 873 F.2d at 852. In addition, ENSIDESA, as loading stevedore, clearly bears responsibility for the dangerous condition presented by the beams which it stowed. ENSIDESA breached its duty of reasonable care under all of the circumstances, *529 in failing to load the vessel so that it could be offloaded with reasonable safety.

JURY INSTRUCTIONS
ENSIDESA and ARCASA submit that the trial court erroneously submitted certain theories of liability under Scindia when there is no evidence in the record to support them. Defendants cite Woods v. Sammisa Company, Ltd, supra, for the proposition that such an error mandates a remand for a new trial.
La.C.C.P. art. 1793(C) states:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
In the instant case, ENSIDESA and ARCASA failed to make a proper objection as required by La.C.C.P. art. 1793(C), and therefore waived their right to raise as an assignment of error the giving of these jury instructions. Moreover, this assignment of error relates to theories of liability involving a hidden danger, one that is not open and obvious. The evidence is undisputed that, as the longshoremen got deeper into the hold and were breaking out the beams, the condition of the stowthe crushed dunnage and interlocking bundles of beamswas open and obvious to them. Unlike the situation in Woods v. Sammisa, supra, we are confident that the jury did not find defendants liable based upon either of the theories involving a hidden danger.

DIRECTED VERDICT
ENSIDESA assigns as error the failure of the trial court to grant its motion for a directed verdict pursuant to La.C.C.P. art. 1810. The denial of a motion for directed verdict is an interlocutory order and is not appealable. Adams v. Pourciau, 417 So.2d 860, 862 (La.App. 4th Cir. 1982), writ denied, 422 So.2d 157 (La.1982). Moreover, under the well-accepted rule for review of judgments granting directed verdicts, there was "substantial evidence" such that "reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Thus the motion was properly denied. Oppenheim v. Murray Henderson Undertaking Co., Inc., 414 So.2d 868 (La.App. 4th Cir. 1982).

MOTION FOR J.N.O.V. AND NEW TRIAL
ENSIDESA and ARCASA assign as error the failure of the trial court to grant a judgment notwithstanding the verdict (J.N.O.V.), or in the alternative, a new trial. A J.N.O.V. should be granted only when the evidence is so overwhelming that no reasonable juror could reach any other conclusion. Further, the trial court cannot consider issues of credibility in reaching its decision. Fernandez v. General Motors Corp., 478 So.2d 999, 1001 (La.App. 4th Cir.1985), reversed on other grounds, 491 So.2d 633 (La.1986); McClain v. Holmes, 460 So.2d 681, 682 (La.App. 1st Cir.1984), writ denied, 463 So.2d 1321 (La.1985).
Considering the evidence, and our finding as to ENSIDESA's and ARCASA's liability, we are unable to say that the trial court erred in denying their motions for J.N.O.V. as to liability. For reasons later discussed, the issue of the J.N.O.V. as to damages is moot.
As to the motions for new trial on the ground that the judgment appeared "clearly" contrary to the law and evidence, La. C.C.P. art. 1972(1), for the foregoing discussed reasons, we find no error on the part of the trial court in failing to grant ENSIDESA or ARCASA a new trial on the issue of liability. Nor do we find any merit to the argument that the trial court abused its discretion by not granting a new trial under La.C.C.P. art. 1973, which provides that the trial court "may" grant a new trial *530 if there is good ground therefor.[4]

MOTION TO CONTINUE
ENSIDESA raises as an assignment of error, the trial court's failure to grant its motion to continue the trial, filed at 2:53 p.m. on Friday, April 14, 1989, less than three days before the Monday, April 17th start of trial. ENSIDESA moved for a continuance to enable it to arrange for an independent medical examination of plaintiff after it allegedly discovered new evidence that plaintiff had been involved in a gunfight in 1986, and received gunshot wounds "that significantly impact[ed]" his medical condition. ENSIDESA claimed that information about the gunshot wounds had never been provided to it despite repeated discovery requests. The motion was denied on the day of trial, April 17th.
In December 1987, plaintiff was examined on behalf of ENSIDESA by Dr. James Laborde, an orthopedist. During the course of this examination X-rays were taken. Dr. Laborde confirmed that the X-rays revealed bullet fragments, including one large fragment in the upper chest region, and another in the area of plaintiff's jaw bone. Dr. Laborde could not recall whether he asked plaintiff about these bullet fragments. Dr. Laborde subsequently discussed his evaluation of plaintiff with counsel for ENSIDESA, and the information is contained in his report.
Dr. Rennie Culver, a psychiatrist, was called as a witness by ENSIDESA. In September 1988, plaintiff was examined by Dr. Culver on behalf of plaintiff's employer, Cooper Stevedoring. During the examination, plaintiff informed Dr. Culver that he had been shot in 1986 and had surgery in connection with the gunshot wound. This information was contained in Dr. Culver's report. Dr. Culver was called as a witness by counsel for ENSIDESA, and questioned extensively about the history or lack of itgiven to him by plaintiff. ENSIDESA knew or should have known of the information in Dr. Culver's report about the gunshot wound(s).
A continuance shall be granted in cases where the moving party shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case. La.C.C.P. art. 1602. Even assuming arguendo that ENSIDESA did not discover that plaintiff had been wounded in a 1986 gunfight until shortly before trial as it claims, considering the foregoing, we are unable to say that it exercised due diligence in discovering this information. It apparently had this information in its possession, or access to it, long before the date set for trial.
A continuance may be granted if there is good ground therefor. La.C.C.P. art. 1601. A trial court's decision to grant or deny a motion for continuance will not be disturbed by an appellate court absent a clear showing of abuse of discretion. Heap v. Weber Const. Co. of Louisiana, Inc., 407 So.2d 799 (La.App. 4th Cir.1981); Clay v. Clay, 467 So.2d 166 (La.App. 3rd Cir.1983). For the foregoing reasons, we are unable to say that the trial court clearly abused its discretion in denying ENSIDESA's motion for a continuance to enable it to schedule an examination of plaintiff relating to the residual effect of the gunshot wounds on his physical condition.

MEDICAL EXAMINATIONS
ENSIDESA raises as an assignment of error the trial court's cancelling of two medical examinations it had scheduled for plaintiff on April 7 and 10. These examinations were scheduled on March 27, 1989, three weeks before trial. Plaintiff maintains that he learned of these scheduled examinations on March 30, 1989. Plaintiff subsequently filed a motion requesting that the trial court cancel the examinations. The trial court did not give any reasons for its granting of plaintiff's motion and cancellation of the examinations. Apparently, it was because the examinations were set 10 and 7 days before the April 17 trial was to begin.
*531 La.C.C.P. art. 1464 authorizes a trial court to order a party to submit to a physical examination. The regulation of medical examinations is subject to the broad discretion of the trial court. Amoco Production Co. v. Columbia Gas Transmission Corp., 455 So.2d 1260, 1265 (La. App. 4th Cir.1984), writs denied, 459 So.2d 542, 543 (La.1984). Absent a clear showing of abuse, the court's rulings on discovery will not be disturbed. John Jay Esthetic Salon, Inc. v. Woods, 422 So.2d 456 (La. App. 5th Cir.1982).
Defendants maintain that the physical examinations were necessary because plaintiff's treating physician, Dr. Watermeier, had only recently made any mention of his carpal tunnel syndrome and they had to respond to this. However, Dr. Watermeier stated in a November 1987 deposition that he had made a "working diagnosis" that plaintiff was suffering from carpal tunnel syndrome, though further tests were needed to confirm this diagnosis. Thus, ENSIDESA was alerted to the possibility of a claim for carpal tunnel syndrome some 16 months before the date set for trial. If it wished to rebut such a claim, it should have had plaintiff examined by its physician at an earlier date. Considering this evidence, we are unable to say that the trial court clearly abused its discretion in granting plaintiff's motion to cancel the medical examinations which had been scheduled by ENSIDESA.
We are also unable to say that the trial court abused its discretion in failing to grant ENSIDESA's alternative motion for a continuance. See La.C.C.P. arts. 1972, 1973, and discussion supra.

STRIKING OF ENSIDESA'S LIABILITY EXPERT
In addition to learning on March 30, 1989 of the two scheduled medical examinations, plaintiff also learned that ENSIDESA planned to call Peter Duffy as an expert on the issue of liability. His testimony would have concerned the alleged dangerousness of the stow aboard the M/V LORENA. Plaintiff objected to the admissibility of this expert's testimony on the grounds that it was too close to trial to add an expert whose testimony would go to the issue of liability. The trial court struck the witness and ENSIDESA applied for writs of certiorari or review to this court. A divided panel of this court denied ENSIDESA's application for writs.[5]
Plaintiff filed his original petition in October 1984, naming ARCASA as a defendant. In August 1985 he filed an amended petition naming ENSIDESA as a party defendant. This was almost four years before trial, and ENSIDESA's notification that it would call Peter Duffy as an expert on the issue of liability. Plaintiff apparently had no knowledge of this witness until March 30, 1989, less than three weeks before trial. Under these circumstances, we are unable to say that the trial court abused its inherent and wide discretion in refusing to allow Duffy to testify.
In addition, defendants presented the substance of Duffy's testimony through other witnesses, albeit fact witnesses, not opinion witnesses. Thus, it does not appear that they were substantially prejudiced by the exclusion of his testimony.

TESTIMONY OF PLAINTIFF'S LIABILITY EXPERT
ENSIDESA and ARCASA filed motions in limine to strike the testimony of plaintiff's liability expert, A.A. Ross, a marine surveyor, who testified extensively about the condition of the stow. The trial court denied the motions, and defendants raise the denial as an assignment of error.
Defendants maintain that Ross testified beyond his expertise; that he was not qualified to testify to the matters he did. Ross was a "marine surveyor," and had been one since 1977. He was hired by Cooper to inspect the cargo of steel beams aboard the M/V LORENA for damage before offloading *532 operations began. He was a graduate of the Nautical College of Scotland and had sailed on ocean going general cargo vessels for fifteen years, rising to commanding officer. He had been a "port captain" for a company that chartered ships and loaded steel out of Antwerp, Belgium. His duties as a port captain included planning the loading of the vessel and working with the master of the vessel loading the ship. He testified that he had supervised both the loading and offloading of steel beams. Ross had previously testified as an expert regarding safety considerations in the handling, loading, and offloading of cargo.
La.C.E. art. 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto, in the form of an opinion or otherwise.
The trial court accepted Ross as an expert in the area of marine surveying and in safety regarding stevedoring operations. Defendants object to Ross's qualifications because he had never been a stevedore or a longshoreman, and had not testified as a "safety expert" before. Also, he was hired only to inspect the condition of the cargo. A trial court is vested with wide discretion in determining the competency and qualification of expert witnesses. Denton v. Mammelli, 447 So.2d 75 (La. App. 4th Cir.1984). Its decision will not be disturbed absent a finding that is clearly wrong as a matter of law. Frank L. Beier Radio, Inc. v. Brown, 453 So.2d 656 (La. App. 5th Cir.1984), writ denied, 458 So.2d 121 (La.1984).
Ross's experience as a port captain, loading and offloading ships, qualified him as an expert regarding stevedoring operations. Considering Ross's qualifications, we are unable to say that the trial court abused its wide discretion in qualifying him as an expert in the area of marine surveying and safety regarding stevedoring operations. Also, for the previously discussed reasons, we find no merit to ARCASA and ENSIDESA's argument that the trial abused its discretion by refusing to allow them to present Peter Duffy's testimony to rebut that given by Ross.

SUBSEQUENT REMEDIAL MEASURES
ENSIDESA claims that the trial court erred in allowing plaintiff to cross-examine its liability witnesses about a change in the way ENSIDESA loaded steel beams after plaintiff's accident. Several ENSIDESA witnesses, foreign employees of the company, testified that in 1983 ENSIDESA began loading steel beams on the "H" at the request of customers, notably U.S. and Canadian companies.
La.Code of Evidence art. 407 states:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility. (emphasis added)
Comment (b) to La.C.E. art. 407 states that this article applies if the substantive law underlying the case is based on some concept of negligence or culpable conduct. Thus, as ENSIDESA submits, the article governs the admissibility of this evidence. In questioning its witnesses, ENSIDESA brought out that there had never been a complaint by a customer about beams stowed on the "H." It was also brought out that ENSIDESA continues to use an "H" stow today, which is true. However, the questions on direct were asked, and the answers given, without mention of the routine loading of steel beams on the "I" since 1983 for U.S. and Canadian bound vessels. The cross examination of these witnesses on the issue of the post-1982 loading of beams on the "I" was directed to the credibility of these witnesses.
*533 We find no merit to ENSIDESA's argument that this evidence was prohibited under La.C.E. art. 407.

OPINION TESTIMONY OF LAY WITNESSES
ENSIDESA raises as an assignment the giving of opinion testimony by plaintiff's lay witnesses, fellow longshoremen, as to the safety of the stow. Plaintiff points out that several lay defense witnesses testified as to the same issue. La.C.E. art. 701 provides that a lay witness may give an opinion if it is:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.
The opinion testimony of plaintiff's lay witnesses meets the criteria set forth in La.C.E. art. 701. Their opinions as to the safety of the stow were rationally based on their perceptions and their experience as longshoremen. Their opinion testimony was helpful to the determination of the primary fact in issue with regard to liability, the safety of the stow.

EXCLUSION OF PLAINTIFF'S CRIMINAL RECORDS
ENSIDESA raises as an assignment of error, the trial court's refusal to allow plaintiff's criminal records into evidence. This assignment of error is raised but not briefed.
Under La.C.E. art. 609 evidence of the conviction of a crime punishable by death or imprisonment for more than six months is admissible for impeachment purposes if the trial court determines that the probative value of the evidence outweighs its prejudicial effect to a party. Only the date of the conviction and the name of the crime for which the witness was convicted is admissible under the article. Evidence of the arrest, indictment, or prosecution of a witness is not admissible for impeachment purposes.
Plaintiff's criminal records proffered by ENSIDESA reflect that he has been convicted of first offense possession of marijuana and first offense carrying of a concealed firearm, both punishable by imprisonment for up to six months. Also proffered was an application for a search warrant to search plaintiff's residence for stolen property, and an inventory form listing a number of items recovered in the search. However, there is no record of plaintiff having been convicted of any crime in connection with the stolen property. Therefore, nothing about plaintiff's criminal history as reflected by the proffered records was admissible under La.C.E. art. 609.

JURY MISCONDUCT
ENSIDESA claims that the trial court erred in failing to grant its motion for a new trial based on jury misconduct. La.C.C.P. art. 1972(3) mandates the granting of new trial where the jury has "misbehaved improperly so that impartial justice has not been done." La.C.C.P. art. 1972 allows the trial court to grant a new trial if there "is good ground therefor."
Following trial, ENSIDESA obtained affidavits by three jurors who stated that during deliberations one juror repeatedly urged a verdict on grounds other than the evidence adduced at trial. The juror allegedly stated that plaintiff should prevail because he was a lone individual fighting corporations. Some of his remarks also allegedly appealed to racial bias and prejudice. One juror-affiant stated that after deliberating almost ten hours, the jurors finally "gave in" to this particular juror out of frustration, and "more than doubled the amount of what would have been their verdict."
La.C.E. art. 606(B) states:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any *534 outside influence was improperly brought to bear upon any juror,.... Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (emphasis added)
Under La.C.E. art. 606(B), the affidavits of these three jurors as to matters or statements made by this particular juror during deliberations are clearly inadmissible to question the validity of the jury verdict.
Prior to Louisiana's adoption of the Code of Evidence, a body of law allowed affidavits such as those offered by ENSIDESA for the limited purpose of showing that a juror responded untruthfully on voir dire. Bennett v. Sedco Maritime, 520 So.2d 894, 904 (La.App. 3rd Cir.1987); Rains v. Diamond M. Company, 396 So.2d 306, 315 (La.App. 3rd Cir.1981), writ denied, 399 So.2d 623 (La.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).
ENSIDESA argues that the affidavits are admissible to show that the juror in question violated his "oath of impartiality." However, the exception cited is not to be employed where the alleged untruthful statement was a general one that the juror could render an impartial verdict. Bennett, supra; Ryals v. Home Insurance Company, 410 So.2d 827 (La.App. 3rd Cir. 1982), writs denied, 414 So.2d 375, 376 (La.1982).
ENSIDESA's argument is directed only to an alleged general statement by the juror that he could be impartial. Thus, the affidavits cannot be considered. ENSIDESA makes no other allegation of jury misconduct. Therefore, we find no error by the trial court in denying ENSIDESA's motion for a new trial based upon jury misconduct. We are also unable to say that the trial court abused its discretion under La. C.C.P. art. 1973 in failing to grant a new trial on discretionary grounds based on conduct by the jury, or in failing to annul the judgment because it was obtained by ill practice.

FAULT OF PLAINTIFF'S EMPLOYER
ENSIDESA claims that the trial court erred in failing to submit an interrogatory as to the fault of plaintiff's employer, Cooper Stevedoring Company.
In the instant case, plaintiff was receiving benefits under the Longshore and Harbor Workers' Compensation Act, (LHWCA) 33 U.S.C.A. § 901 et. seq. His exclusive remedy against Cooper was under the provisions of the LHWCA. There is no provision under the LHWCA providing for the apportionment of fault to an employer. In fact, it has been held that in an action under 33 U.S.C.A. § 905(b), the issue of an employing stevedore's negligence should not be submitted to the jury. Samuels v. Empresa Lineas Maritimas Argentinas, 573 F.2d 884 (5th Cir.1978).
La.C.C.P. art. 1812(c)(2) provides that a trial court may submit an interrogatory to a jury inquiring whether any person other than the plaintiff was at fault, and if so the percentage of fault. See Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984). However, In both Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991), and Melton v. General Electric Co., Inc., 579 So.2d 448 (La.1991), the Louisiana Supreme Court rejected the idea that in a suit by an employee against a third-party tortfeasor, La.C.C.P. art. 1812(c)(2) allowed a trial court to submit an interrogatory to a jury regarding an employer's fault. The court held that consideration of an employer's fault would offend a basic principle of the worker's compensation scheme, that an employer is liable only for compensation benefits, not tort damages. The principles underlying both the Louisiana Worker's Compensation Act and the LHWCA are the same regarding employer fault. La.C.C.P. art. 1812(c)(2) does not require the submission of an interrogatory to the jury as to the fault of an employer in a suit against third-party tortfeasors under the LHWCA.
ENSIDESA next submits that the trial court erred in failing to disclose Cooper's *535 interest to the jury so that it could weigh the credibility of its employees who testified at trial. The record reflects that the trial court instructed the jury as to the relevance of Cooper's fault. The Cooper employees who testified at trial had nothing to personally gain from their testimony, although Cooper itself was seeking to recoup compensation benefits it had paid plaintiff. The jury was well aware that these men were plaintiff's fellow workers, a fact seemingly much more indicative of possible bias than the fact that their employer had a monetary interest in the outcome of the trial. Any evidence as to Cooper's claim for reimbursement was properly excluded on the ground that its probative value on the credibility of the witnesses was substantially outweighed by the danger of unfair prejudice to the plaintiff. La.C.E. art. 403.

CLOSING ARGUMENT
ENSIDESA submits that the trial court erred in failing to grant a new trial on the ground that the jury was "inflamed by plaintiff's counsel's clear breach of the `Golden Rule'" during closing argument.
The "Golden Rule [Argument]" refers to an argument exhorting that the jury place itself in a party's shoes with respect to damages. Duerden v. PBR Offshore Marine Corporation, 471 So.2d 1111 (La.App. 3rd Cir.1985), writ denied, 476 So.2d 355 (La.1985); Burrage v. Harrell, 537 F.2d 837 (5th Cir.1976). The "Golden Rule" is limited to application in those cases where the exhortation is with respect to damages.
We first note that the record does not contain a transcript of the closing arguments of counsel. The record does reflect that counsel for ENSIDESA made an objection to remarks made by opposing counsel during closing argument. However, even at the time he made the objection, counsel for ENSIDESA stated that he couldn't recall exactly what was said. In its brief on appeal, counsel for ENSIDESA uses partial quotations of what opposing counsel allegedly stated. None of these partial statements directly implore jurors to put themselves in plaintiff's shoes vis-a-vis his medical condition. The partial statements, even considering the context in which counsel for ENSIDESA places them, are not the type that would incite jurors to render a verdict based upon their emotions rather than the evidence. In addition, the trial court carefully instructed the jury that the statements of counsel were not evidence.
We find no merit to this assignment of error.

LIMITATION OF MEDICAL EVIDENCE
ENSIDESA claims that the trial court erred in refusing to allow it "to call Dr. Bogran to testify," and in prohibiting it from "using Dr. Bogran's report to properly cross-examine other physicians." Dr. Bogran treated plaintiff following a 1987 automobile accident.
The record does not substantiate ENSIDESA's assertion that the trial court refused to allow Dr. Bogran to testify. The issue of Dr. Bogran's treatment of plaintiff arose during the direct examination of ENSIDESA's expert psychiatric witness, Dr. Culver. Counsel for ENSIDESA sought to have Dr. Culver give an opinion as to the possibility of plaintiff malingering, based upon medical information contained in a report by Dr. Bogran. The court asked if Dr. Bogran was going to be called as a witness. Counsel for ENSIDESA responded that he was under subpoena, and indicated that he would be called "if necessary." The court responded that Dr. Culver might need to be recalled. The import of this colloquy was that the trial court was not going to allow questions of Dr. Culver regarding Dr. Bogran's report unless Dr. Bogran would be called as a witness. Nowhere is there an indication that Dr. Bogran was not going to be allowed to testify.
*536 The trial court allowed liberal examination of witnesses by both sides concerning findings and opinions of physicians who were not called to testify at trial. The trial court apparently felt that, because Dr. Bogran was under subpoena and available to testify, evidence as to his report would not be allowed. Dr. Bogran's report was technically hearsay, and therefore inadmissible as evidence. See Jackson v. Tyson, 526 So.2d 398 (La.App. 4th Cir.1988); Hoofkin v. Bourne, 469 So.2d 24 (La.App. 1st Cir. 1985). Under these circumstances we find no error with the trial court's decision not to allow questions by ENSIDESA of its own witness as to findings of Dr. Bogran as reflected in his report. Nor do find error in the trial court's refusal to allow into evidence Dr. Bogran's report without his testimony.

EVIDENCE OF UNRELATED PRIOR LAWSUIT
ENSIDESA next claims that the trial court erred in refusing to allow into evidence a petition filed by plaintiff, or his attorney, in connection with a 1987 accident. The suit, filed in First City Court for the Parish of Orleans, purportedly sought damages for personal injuries and property damage. Plaintiff was cross-examined as to the suit, and maintained that all he wanted out of the action was recovery for property damage to his vehicle. He said he knew nothing of a claim for personal injuries. ENSIDESA sought to introduce the petition at the same time it tried to admit Dr. Bogran's report.
We are unable to say the trial court abused its discretion in disallowing the petition on the grounds that its relevancy was substantially outweighed by its prejudicial effect to plaintiff. La.C.E. art. 403.

TESTIMONY OF PLAINTIFF'S ECONOMIST
ENSIDESA next claims that the trial court erred in failing to strike the testimony of plaintiff's expert economist. ENSIDESA submits that the expert, Dr. Philip Jeffress, incorrectly included vacation and holiday benefits twice in his calculations of future and past wage loss. ENSIDESA cites further errors on the expert's part, such as "ignor[ing] the downturn in the local economy", "us[ing] an unrealistically low discount rate," and using "a legally improper work life expectancy."
A trial court is vested with wide discretion in determining the competency and qualification of expert witnesses. Denton v. Mammelli, 447 So.2d 75 (La.App. 4th Cir.1984). Its decision will not be disturbed absent a finding that it clearly wrong as a matter of law. Frank L. Beier Radio, Inc. v. Brown, 453 So.2d 656 (La.App. 5th Cir. 1984), writ denied, 458 So.2d 121 (La.1984).
Dr. Jeffress was cross-examined extensively as to his calculations. Any alleged inaccuracies were brought to the attention of the jury. Under these circumstances, and considering the discretion vested in the trial court in these matters, we are unable to say that it was error to refuse to strike the economist's testimony.

DAMAGES
Both ARCASA and ENSIDESA raise issues concerning the amount of damages awarded by the jury. Both ENSIDESA and ARCASA raise as an assignment of error, the trial court's failure to grant a remittitur. La.C.C.P. art. 1814. We will treat this as an assignment of error as to the excessiveness of the jury award. We have all of the facts before us to amend the verdict with respect to damages. The assignment of error as to remittitur is, for practical purposes, moot. If we found that the trial court erred in denying the motion for remittitur, it would offend the principles enunciated in Gonzales v. Xerox Corporation, 320 So.2d 163 (L.a 1975), to remand for a new trial on the issue of damages when the facts are before us.
The jury awarded plaintiff $1,700,000.00 in damages, itemized as follows:

*537
Future medical expenses;[6] $ 300,000.00
Past physical and mental pain and suffering and disability from date
 of accident to date of trial; $ 325,000.00
Future physical and mental pain and suffering and disability; $ 450,000.00
Past loss of earnings or earning capacity from date of accident to
 date of trial; $ 175,000.00
Future loss of earnings or earning capacity. $ 460,000.00
 _____________
TOTAL $1,700,000.00

1. Causation:

We first address the issue of causation. The jury determined that the fault of ARCASA and ENSIDESA contributed to plaintiff's damages. This is a question of fact. The finding of the jury as to causation of damages may not be disturbed by this court unless (1) the record evidence does not furnish a basis for such a finding, or (2) that finding is nevertheless clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, Co., 283 So.2d 716 (La.1973).
Plaintiff claimed both psychic and physical injuries. Dr. John Watermeier, an orthopedist, testified on behalf of plaintiff. Plaintiff had previously been seen by one of Dr. Watermeier's associates. Plaintiff's history reflected the November 1982 work-related injury and resulting hospitalization. Plaintiff apparently underwent diagnostic tests and conservative treatment following the accident, with no improvement, and Dr. Watermeier subsequently took over his treatment in April 1983.
Upon examination, plaintiff complained of "a lot of pain." Had pain in his back radiating down his leg. His objective findings were muscle spasm and limited range of motion in his back. Dr. Watermeier felt that the most probable cause of plaintiff's pain was a symptomatic or bulging disc in the lower back. He gave plaintiff a chemopapain injection in April 1983, which appeared to have provided some relief for a week or so. In June 1983 plaintiff continued to complain of back and leg pain. He walked with a severe limp and severe straight leg raising signs. Dr. Watermeier performed a lumbar laminectomy on June 24, 1983. He found a bulging disc irritating a nerve. Following discharge on June 28, plaintiff appeared to be doing better, although he still complained of back pain. Dr. Watermeier subsequently performed a spinal fusion on plaintiff in 1985.
It was Dr. Watermeier's opinion that the cause of plaintiff's low back pain was his November 1982 accident aboard the M/V LORENA. He said that a prior back injury sustained by plaintiff in 1980, for which he was apparently treated over a course of several months, was not the cause of his post-November 1982 problems. Dr. Watermeier stated that plaintiff would not have been able to work from 1980 to November 1982 with a herniated disc. He further stated that plaintiff had not complained of any leg pain in connection with the 1980 treatment, but did after the November 1982 accident. Plaintiff had also been treated over the years, as far back as 1968, for other minor injuries. Dr. Watermeier felt these injuries were not the cause of plaintiff's post-November 1982 problems. He also admitted that plaintiff had degenerative changes in his spine dating as far back as 1968, but again, this fact did not affect his opinion. Nor did he believe that a contusion to the cervical spine from a 1986 gunshot wound was the cause of plaintiff's current problems. Finally, told of plaintiff's September 1987 automobile accident, of which Dr. Watermeier was unaware, *538 he stated that he saw plaintiff approximately two weeks after the 1987 accident and plaintiff had the same complaints as before. His opinion as to causation was primarily based upon the history given by plaintiff.
Dr. Watermeier stated that in September or December 1983 plaintiff complained of pain in his left wrist and left forearm. He admitted, however, that he didn't have much concern about the arm and wrist pain until October 1987. Dr. Watermeier stated that a review of plaintiff's records showed some injury to plaintiff's arm at the time of the November 1982 accident. He had made a "clinical diagnosis" of carpal tunnel syndrome, but not a "definitive diagnosis." On cross-examination he admitted that it was not his diagnosis that plaintiff has carpal tunnel syndrome.
In early 1984 Dr. Watermeier began giving plaintiff injections of Marcaine, a long-lasting anesthetic. These were administered monthly or bi-monthly. He also prescribed plaintiff 30-40 Percodan pain medication pills a month. In addition, plaintiff has been hospitalized several times for morphine epidurals. All of these were for treatment of plaintiff's complaints of pain. Dr. Watermeier saw plaintiff as continuing to suffer from pain in the future. He believed plaintiff will have to live with pain the rest of his life.
Dr. Watermeir testified that from 1983 when he first saw plaintiff, until July 1986, he considered plaintiff totally disabled. As of July 1986, he felt that plaintiff could work at some "light activity," but not as a longshoreman. On examination in May 1987 he found plaintiff totally disabled. From February 1988 until the time of trial he said plaintiff was totally disabled. As of the time of trial, he thought plaintiff would have trouble even doing light duty work, but might be trained to perform some type of sedentary work.
Dr. Robert Newman, a psychiatrist, testified on behalf of plaintiff. Dr. Newman first saw plaintiff in April 1988. He treated plaintiff on a regular basis between April 1988 and September 1988. He didn't see plaintiff from late September to late January 1989, when he began treating him again. He continued to treat him at the time of trial, April 1989.
Dr. Newman diagnosed him as suffering from an adjustment disorder with depression; he also had a dependent personality, and a psychogenic pain disorder. The dependent personality was not something that, in Dr. Newman's opinion, resulted from the November 1982 accident. Based upon the history given him by plaintiff, Dr. Newman felt that plaintiff was depressed because he can no longer do longshoreman work. As a result of being unable to work because of his back problem, he said plaintiff suffers from a lack of self-esteem. His sense of self-worth was based primarily upon his ability to do heavy manual labor as a longshoreman. Thus, his psychological condition is a direct result of his 1982 accident aboard the M/V LORENA.
Dr. Newman prescribed an anti-depressant medication for plaintiff which he continued to take at the time of trial. He believed that plaintiff would need to continue to take the medication in the future. Dr. Newman didn't know the cost of the medication. Based on an extensive history given by plaintiff, Dr. Newman felt that plaintiff had not really been depressed before the November 1982 accident. Dr. Newman was referred to a 1980 report by another physician, an orthopedist, who found that plaintiff was depressed following a work-related injury which prevented him from working. While Dr. Newman questioned whether an orthopedist was qualified to give a medical opinion as to depression, he admitted that if plaintiff couldn't work, he may well have been depressed. This is same reason he believed was the primary cause of plaintiff's depression after the November 1982 accident.
Dr. Newman believed that plaintiff's complaints of pain and numbness in his arm had a psychological basis. They were psychogenic in nature. He said he was not sure whether the low back pain was psychogenic. There were no objective symptoms accounting for the pain. Dr. Newman testified that he considered but rejected the possibility that plaintiff was malingering, *539 even though plaintiff appeared to meet several criteria of a person malingering. Dr. Newman felt that plaintiff would not recover from the psychogenic pain disorder. He didn't believe working would "really help" plaintiff unless he could do the type of work he had done before the accident. The self-esteem he had achieved before the accident was largely built around a laboring job. Dr. Newman admitted, however, that it would help plaintiff if he found some employment. This was apparently not limited to work involving heavy manual labor.
Defendants presented an expert in the field of orthopedics, Dr. James Laborde. He evaluated plaintiff on behalf of ENSIDESA on December 7, 1987. Dr. Laborde took a history from plaintiff, took x-rays, and evaluated x-rays of plaintiff taken by others. He stated that the history and clinical diagnosis both pointed to nonorganic or psychogenic pain. However, he said that this diagnosis of nonorganic pain did not rule out an underlying problem. He also found degenerative changes, arthritis, in plaintiff's spine. These were present in 1983-84 x-rays. He found no evidence of carpal tunnel syndrome in plaintiff's wrist. He felt that plaintiff could return to light-duty work.
On cross-examination by counsel for plaintiff, Dr. Laborde admitted that ordinary x-rays will not directly show a nerve or disc problem. He went on to say, however, that it was his opinion that even if there is an actual herniated disc or nerve impingement, you cannot tell whether that is causing pain. Dr. Laborde said that all lumbar discs bulge to some extent, with the degree of bulging gradually increasing with age as a part of the degenerative process. He said that there is no way to objectively determine whether a herniated disc is the result of a specific injury or a consequence of the normal degenerative process.
Dr. Rennie Culver, a psychiatrist, testified on behalf of defendants. Dr. Culver evaluated plaintiff on September 14, 1988. Dr. Culver, as did Dr. Laborde, saw plaintiff only once for examination in connection with this litigation. Neither of them ever treated plaintiff. Dr. Culver took a history of plaintiff and did a standard mental status examination. Dr. Culver stated that plaintiff only informed of the November 1982 accident and the 1986 gunshot wounds. Dr. Culver's impressions were that plaintiff was suffering from depression, had a psychogenic or somatoform pain disorder, and had a dependent personality. This was the exact same diagnosis Dr. Newman made. Dr. Culver did not render an opinion regarding the possibility of plaintiff's malingering. A diagnosis of malingering would have been inconsistent with Dr. Culver's diagnosis of somatoform or psychogenic pain disorder, which presupposes genuine symptoms of pain.
Dr. Culver testified that based upon the history given by plaintiff, the somatoform pain disorder first arose after plaintiff's November 1982 accident. But, he said he couldn't be certain; it could have arisen at any time. It was his opinion that the somatoform or psychogenic pain disorder resulted from plaintiff's depression. It was, he said, part of the depressive symptomatology. He also said that persons with dependent personalities were inclined to have psychogenic pain and were predisposed to depression. However, Dr. Culver agreed that the November 1982 injury was a cause of plaintiff's depression. He said that it appeared that following the injury, the quality of his functioning "decreased significantly," and he became more depressed.
Defendants directed their attack to plaintiff's credibility and the testimony of medical experts whose opinions rested largely on histories given them by plaintiff.
The jury had before it much evidence upon which to evaluate plaintiff's credibility on the issues of causation as to damages. The Louisiana Supreme Court addressed the role of an appellate court in reviewing factual determinations by juries made primarily on the credibility of witnesses in Rosell v. ESCO, supra. The court stated:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong *540 standard demands great deference to the trier of facts' findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Although the evidence showed that plaintiff had some minor injuries prior to his 1982 accident, including at least one to his back, the jury had before it evidence that his current condition was the result of the 1982 accident. Even if they had some effect, such as rendering plaintiff more susceptible to a subsequent injury, it is well-settled that a tortfeasor is responsible for the consequences of its tort even though those damages are greater because of pre-existing condition. Reck v. Stevens, 373 So.2d 498 (La.1979); Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4th Cir. 1988).
Similarly, though there was evidence that plaintiff received three gunshot wounds in 1986, and was involved in an automobile accident in 1987 in which he may have received injuries, the evidence as a whole furnishes a basis for a finding that neither of these incidents was the cause of plaintiff's physical or psychogenic problems.
While the testimony of the medical experts conflicts in some areas, again we are unable to say that the evidence as a whole does not furnish a basis for the finding that the negligence of ARCASA and ENSIDESA caused damage to plaintiff, or that such a finding was clearly wrong. The issue for our consideration is the extent of damages.
However, while there is some evidence that plaintiff experiences pain in his arm, and that this pain could be related to his 1982 accident, the evidence does not furnish a finding that plaintiff has carpal tunnel syndrome. Dr. Watermeier, plaintiff's treating orthopedist, could state only that he had "an impression" that plaintiff was suffering from carpal tunnel syndrome. He had not made a definitive diagnosis. Also, Dr. Laborde, defendants' orthopedist, ruled out carpal tunnel syndrome. There was no other evidence that plaintiff was suffering from carpal tunnel syndrome. Therefore, the jury would have been clearly wrong in awarding any damages related to carpal tunnel syndrome.

2. Special Damages:

A. Future Medical Expenses:
Future medical expenses must be established with some degree of certainty. Wilson v. Magee, 359 So.2d 315 (La.App. 4th Cir.1978), modified on other grounds, 367 So.2d 314 (La.1979). However, an award of future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974), reversed on other grounds by Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4th Cir.1990).
Insofar as future medical expenses were concerned, Dr. Watermeier, plaintiff's treating orthopedist, saw a "possible" disc removal and bone graft fusion costing from $15,000.00 to $20,000.00. Another option, he said, were the $2,000.00 morphine epidurals every two months. He mentioned the Marcaine injections which he said plaintiff had been receiving, as of the time of trial, almost every month. He predicted plaintiff would need to continue receiving the Marcaine injections at $22.00 per injection. The jury could have reasonably awarded plaintiff future medical expenses in the amount of $20,000.00 for surgery, $22.00 per month for the future monthly Marcaine injections, and $2,000.00 every *541 two months, or $12,000.00 per year, for morphine epidurals.
Dr. Watermeier testified that he expected that plaintiff would need to continue to see him every month or two at $34.00 a visit. He said that plaintiff's Percodan pain medication costs about $15.00 per month. Presumably, Dr. Watermeier felt that plaintiff would continue to need Percodans for the rest of his life, and continue to see him for the rest of his life. Dr. Watermeier did not personally give an opinion as to plaintiff's life expectancy.
Dr. Newman stated that plaintiff would need to be treated in the future. The only specific course of treatment mentioned was relaxation therapy at intervals of perhaps every two weeks for one-half hour at a time. The cost would be $82.50 per half hour. Presumably, this would be for the rest of plaintiff's life.
We will assume that plaintiff needs to continue seeing Dr. Watermeier every month at $34.00 per month, or $408.00 per year; that he will continue to need Percodans at $15.00 per month or $180.00 per year; that he will need Marcaine injections once a month at $22.00, or $264.00 per year; and that he would need therapy from Dr. Newman every two weeks for one-half hour at $82.50 a session or $2,145.00 per year. Add in the future morphine epidurals at $12,000.00 per year for a total annual expense of $14,997.00.
An expert economist presented by plaintiff testified that his work life expectancy was 10.1 years. The jury could have reasonably set his life expectancy at 70 years. Plaintiff was fifty-three years old at the time of trial, leaving 17 years of future medical expenses. His total annual future medical expenses for 17 years amounted to $254,949.00. Add to this the $20,000.00 for future surgery, for a total of $274,949.00. The jury awarded plaintiff $300,000.00. The award will be reduced to $274,949.00.

B. Past Loss of Earnings:
The jury awarded plaintiff $175,000.00 for past loss of earnings. Special damages for loss of earnings up to the time of trial should be calculated with a certain degree of mathematical certainty, and such awards are not subject to the much discretion rule applicable to general damages. See Cookmeyer v. Langston, 487 So.2d 525 (La.App. 4th Cir.1986); Eddy v. Litton, 586 So.2d 670 (La.App.2d Cir.1991); writ denied, 590 So.2d 1203 (La.1992).
Dr. Philip Jeffress testified as an expert economist for plaintiff. Dr. Jeffress calculated that plaintiff's total past lost wages were $203,746.00. This figure was broken down into $141,365.00 for after tax wage losses, and $62,381.00 for non-wage benefits. The figure was based on an annual income of $25,585.00 per year, based upon plaintiff's 1980, 1981 and 1982 earnings as reflected by plaintiff's W-2 forms. Dr. Jeffress also stated that he considered what other similarly situated longshoremen were earning. He said he did not consider any type of pay raise in making his calculations.
The estimate was also based on a work-life expectancy of 10.1 years, a figure derived from Bureau of Labor Statistics, U.S. Department of Labor. In arriving at these figures Dr. Jeffress assumed that longshoring work would be available to plaintiff. The figures did not take into account any slowing of port activity at the Port of New Orleans. Finally, Dr. Jeffress admitted that his figures and calculations were based upon the assumption that plaintiff could not ever return to work of any kind. He stated that if plaintiff had worked, that income would be deducted from his figures.
The lost fringe benefits were calculated by considering collective bargaining agreements for a per hour based amount that the employer sets aside or contributes in fringe benefits for longshoremen. He then simply calculated the number of hours plaintiff would have worked and multiplied it times the fringe benefit hourly figure. However, when asked whether plaintiff's W-2 forms reflected vacation and holiday pay as earnings, Dr. Jeffress admitted that it looked like these amounts were included. He stated that if that was the case, his figures would have to be revised to take that into account. As will be discussed below, defendants' presented testimonial *542 evidence that holiday and vacation pay were included as earnings. However, Dr. Jeffress made no amended calculations taking that factor into consideration.
The defense presented a witness, Win Niemand, who was then employed by the New Orleans Steamship Association on its labor relations staff. In his position, Niemand negotiated with the International Longshoremans' Association in collective bargaining. Niemand testified that vacation and holiday pay appear as earnings on a longshoreman's W-2 form, and that plaintiff's 1982 W-2 form reflected just such a figure.
Niemand also testified concerning welfare (medical) pension benefits. The welfare benefits covered plaintiff and his dependents. Niemand testified that someone such as plaintiff, who had been a longshoreman since 1968 and worked a certain number of hours, would be entitled to contributions towards his welfare and pension plans after a November 1982 injury. These contributions to the welfare and pension funds would be made for a maximum of 400 weeks, 7.6 years, as long as the injured person is receiving worker's compensation benefits. His coverage under the welfare plan for he and his dependents would be the same, excluding payment of any medical expenses related to the injury, as if he were working full time. His pension benefits would continue to accrue as if he were working full time.
Niemand also computed the amounts plaintiff would have earned between the time of his accident and the time of trial based upon average hours worked by longshoremen in general, and average hours worked by plaintiff in previous years. Niemand's calculations were significantly lower than those by Dr. Jeffress. For instance, using contract years running from October through September, he calculated that plaintiff would have earned $12,000.00 in 1986-87, and $13,000.00 in 1987-88. He said these figures took into account slow port activity and fewer average hours worked by longshoremen.
Defendants also presented an expert economist, Dr. Kenneth Boudreaux, who testified that plaintiff's past loss earnings amounted to $53,373.80. His figures included a reduction in the number of hours worked by longshoremen.
The jury could have reasonably found sufficient evidence to accept the figure supplied by Dr. Jeffress as to plaintiff's past lost wages in the amount of $141,365.00. We are unable to say that such a determination would be clearly wrong. However, it was established that Dr. Jeffress incorrectly included as lost fringe benefits holiday and vacation pay. Because he failed to amend his calculations to reflect this fact, the jury was clearly wrong in awarding the full amount of lost benefits which included holiday and vacation pay. The jury did not have sufficient evidence to determine what portion of Dr. Jeffress calculations for fringe benefits represented holiday and vacation pay. Therefore, plaintiff failed to establish the amount of lost benefits with any reasonable degree of mathematical certainty, and the jury erred in awarding any amount of damages for this loss. We will amend the judgement to subtract the amount of $62,381.00 for loss of fringe benefits.

C. Future Loss of Earnings:
The jury trial found that plaintiff was entitled to $460,000.00 in damages for loss of future earnings. Before he can recover damages for future lost wages, a plaintiff must prove the loss with reasonable certainty. Whatley v. Regional Transit Authority, 563 So.2d 1194 (La.App. 4th Cir.1990), writ denied, 569 So.2d 965 (La. 1990). See also, McGowan v. Sewerage and Water Board of New Orleans, 555 So.2d 472 (La.App. 4th Cir.1989). However, such damages need not be proven with mathematical certainty. Whatley v. Regional Transit Authority, supra. Generally, a reviewing court should affirm the award if it can be reasonably supported under an interpretation of the evidence most favorable to the plaintiff. See Bailes v. U.S.F. & G., Co., 512 So.2d 633 (La. App.2d Cir.1987).
*543 Plaintiff's own expert economist, Dr. Jeffress', only calculated plaintiff's future lost earnings to be $281,475.00, $189,732.00 in lost wages and $91,743.00 in lost fringe benefits. There was no evidence to substantiate a greater award, and any jury award above that must be considered as unsupported by the evidence. In addition, Dr. Jeffress' calculation regarding fringe benefits were again incorrectly based on holiday and vacation pay not being included as wages on plaintiff's W-2 form.
Defendants' expert, Dr. Boudreaux, calculated plaintiff's future lost earnings to be $4,748.00. Dr. Boudreaux arrived at his calculations based on plaintiff having a shorter work life expectancy than projected by Dr. Jeffress. Dr. Boudreaux also factored in plaintiff's being able to work at a job paying $4.10 per hour. This was apparently based on the testimony of Jennifer Palmer, a vocational rehabilitation counselor presented as a witness by defendants. Ms. Palmer felt that plaintiff would be qualified to work as a cashier or a bank messenger.
Again, as in reviewing the award for past loss of earnings, we believe the jury could have reasonably accepted Dr. Jeffress' testimony and awarded plaintiff $189,732.00 for future lost wages, but not the $91,743.00 for future lost fringe benefits. Dr. Jeffress made no amended calculations to account for holiday and vacation pay being included in plaintiff's W-2 wages. His original calculations were incorrect. The jury could not have speculated as to what percentage of the total amount for lost future fringe benefits was represented by the holiday and vacation pay improperly included in the total amount. There was insufficient evidence to award anything greater than $189,732.00 for future loss of earnings. The jury was clearly wrong in awarding more than that amount.
We will amend the judgment of the trial court to reduce the damages for future loss of earnings to $189,732.00.

3. General Damages:

The jury awarded plaintiff $325,000.00 in damages for past physical and mental pain, suffering and disability, and $450,000.00 for future physical and mental pain, suffering and disability. Defendants claim these damages are excessive and contrary to the law and evidence.
Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Only after finding that the record shows that the trial court abused its discretion can the appellate court disturb the award, and then only to the extent of raising or lowering it to the highest or lowest point which would have been within the discretion afforded the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Reck v. Stevens, 373 So.2d 498 (La.1979); Burton v. Berthelot, 567 So.2d 649 (La.App.1990). Before an appellate court questions a trial court award as inadequate or excessive, it must look not to prior awards, but to the individual circumstances of the instant case. Reck v. Stevens, 373 So.2d at 501.
As a result of the accident plaintiff underwent a lumbar laminectomy and a spinal fusion. He has suffered significant pain since the accident and will continue to experience that pain the rest of his life. He takes pain medication prescribed by Dr. Watermeir and gets monthly injections to further relieve his pain symptoms. He has also had morphine epidurals, injections of morphine directly into his spine, to relieve pain. Dr. Watermeir testified that plaintiff cannot return to work as a longshoreman and would have trouble doing even light duty work because of his injuries. Dr. Newman's testimony supports the view that the accident and resulting injuries and complications have adversely impacted plaintiff's mental health, and will continue to do so the rest of his life. According to Dr. Newman, plaintiff's sense of self-worth was directly tied to his ability to earn a living as a longshoreman and provide for his family.
Plaintiff testified that he worked as a longshoreman from 1968 until his 1982 injury. *544 He said he loved his job. After the accident he stopped getting along with his wife. He felt as if he could not get himself back together after the accident. Despite his two surgeries he still experiences pain.
Considering all of the evidence, however, we find the awards for both past and future general damages are a clear abuse of discretion. After reviewing awards made for similar injuries, we reduce both awards to $250,000.00, which we believe are the highest amounts that would have been within the discretion of the jury to award.

INDEMNIFICATION
The cross-claims of ARCASA, the owner of the vessel, and ENSIDESA, the charterer of the vessel, were severed and tried before the court without a jury. The trial court dismissed the claims of both parties. Both parties now appeal. We affirm the trial court's dismissal of the cross-claim filed by ENSIDESA, but reverse the dismissal of the cross-claim filed by ARCASA.
In support of its cross-claim for indemnity, ENSIDESA argues that ARCASA had officers and crew present during the offloading and submits that, if the discharge was unsafe, one of the ARCASA personnel had the opportunity and the duty to stop it. We reject this argument. The evidence shows that the cause of the accident was not the unsafe offloading of the cargo, but the loading and stowing of the cargo, for which the jury found ENSIDESA 85% at fault and ARCASA 15% at fault. The evidence further showed that the cargo was being offloaded as safely as possible by the only means available. The trial court judgment dismissing ENSIDESA's cross-claim is therefore affirmed.
ARCASA, the owner of the vessel, bases its cross-claim for indemnity on the contract or standard GENCON charter party entered into by ENSIDESA and ARCASA. Part I, § 15 of the charter party agreement states, in pertinent part:
Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless)
In the box provided in Part I § 15 was typed "See clause 5(b)," indicating that the parties chose clause 5(b) of Part II of the charter party to govern their contractual rights and responsibilities insofar as the "loading and discharging costs." Clause 5 of Part II of the charter party provides:
5. Loading Discharging Costs
(b) F.i.o. and free stowed trimmed The cargo shall be brought into the holds, loaded, stowed and or trimmed and taken from the holds and discharged by the Charterers or their agents, free of any risk, liability and expense whatsoever to the owners. (Emphasis added.)
The contract language quoted above unequivocally relieves ARCASA from any liability for injuries incurred during the loading or offloading of the cargo in question. ENSIDESA nevertheless argues that the agreement should not relieve ARCASA from liability for the plaintiff's injuries in this case, citing Woods v. Sammisa Co., Ltd., 873 F.2d 842 (5th Cir.1989), in which a charterer was held liable for injuries despite the following contract language based on Clause 8 of the New York Produce Exchange party:
The Captain (although appointed by the Owners) shall be under the orders and directions of the charterers as regards employment and agency; and the charterers are to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain who is to sign Bills of lading for Cargo as presented in conformity with the Mate's or Tally Clerk's receipts without prejudice to this Charter Party. (Emphasis added.)
We hold that the result in this case is not governed by Woods because the two agreements in question are vastly different on the question of liability for injuries incurred in loading and unloading cargo. The agreement in the instant case expressly provides that ARCASA is to be completely free of "risk, liability and expense," while the New York agreement in Woods refers only to expense, without making any reference to risk or liability. The different language demands a different result. ARCASA *545 is entitled to indemnity from ENSIDESA for the 15% of the liability imposed by the jury for plaintiff's injuries.
Accordingly, the trial court judgment dismissing ARCASA's cross-claim against ENSIDESA is reversed. ENSIDESA is ordered to provide indemnity to ARCASA for its portion of the plaintiff's damages.
For the foregoing reasons, we reverse the judgment of the trial court in part, and amend it to order ENSIDESA to indemnify ARCASA for ARCASA's proportionate share of the damages awarded to plaintiff. We further amend the judgment of the trial court to award damages, excluding past medical expenses, as follows:

Future medical expenses; $ 274,949.00
Past physical and mental pain and suffering and disability from date
 of accident to date of trial; $ 250,000.00
Future physical and mental pain and suffering and disability; $ 250,000.00
Past loss of earnings or earning capacity from date of accident to
 trial; $ 141,365.00
Future loss of earnings or earning capacity. $ 189,732.00
 -------------
TOTAL $1,106,046.00

We affirm the judgment as amended and in all other respects.
REVERSED IN PART; AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] Defendants raise as an assignment of error the trial court's qualification of Ross as expert regarding stevedoring operations, as well as the trial court's exclusion of an expert liability witness, Peter Duffy. See discussions, infra.
[2] 33 U.S.C.A. §§ 901 et seq.
[3] 33 U.S.C.A. § 905(b) provides in relevant part:

In the event of injury to a person covered under this chapter caused by the negligence of the vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.
[4] ENSIDESA's argument that a new trial was mandated under La.C.C.P. art. 1972(3), on the ground of jury misconduct, will be addressed later in this opinion.
[5] A denial of an application for writs of certiorari or review does not preclude reconsideration of the same issue on appeal, and there, reaching a different conclusion as to it. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Jenkins, 558 So.2d 800 (La.App. 5th Cir.1990). See also, Gulf Utilities Co. v. Dixie Elec. Mem. Corp., 248 La. 458, 179 So.2d 637 (1965).
[6] The issue of past medical expenses was not submitted to the jury and is not at issue on appeal.